UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH BURNS,                                              :

                Petitioner,                  :          07 Civ. 7870 (AJP)
                                                         (04 Crim. 0142 (RJH))

                -against-                    :          **OPINION AND ORDER**

UNITED STATES OF AMERICA,                 :

                Respondent.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Petitioner Joseph Burns, represented by counsel, has petitioned pursuant to 28 U.S.C. § 2255 to vacate his sentence of 180 months imprisonment.  (07 Civ. 7870,[1] Dkt. No. 1: Pet. at ¶ 2.) Burns claims that he was denied effective assistance of counsel because:  (1) his first attorney, Alan Seidler, "advised Petitioner to attend proffer sessions with the government without first debriefing him and explaining any risks; in particular, . . . that the disclosures made during the proffer sessions might both increase Petitioner's adjusted base offense level and preclude him from getting a downward departure on the basis of the 'safety valve'" (Dkt. No. 90: Burns § 2255 Br. at 2);[2] and (2) Burns' second attorney, Robert Feldman, failed at sentencing to "address the statutory factors set forth in 18 U.S.C. § 3553(a)" and urge Judge Mukasey to consider Burns' attempt at cooperating with

---

[1]     Docket numbers preceded by 07 Civ. 7870 refer to documents filed in this § 2255 proceeding.  References to document numbers that are not preceded by 07 Civ. 7870 were filed in the underlying criminal case, 04 Crim. 0142.

[2]     By counsel's letter dated December 1, 2008, Burns withdrew this first claim with prejudice. (07 Civ. 7870, Dkt. No. 13: Neuman 12/1/08 Letter to Court; see page 22 & n.3 below.)

the government even though the government refused to submit a 5K1 letter (Burns § 2255 Br. at 2, 16).

The parties have consented to decision of Burns' § 2255 petition by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (See 07 Civ. 7870, Dkt. No. 8.)

For the reasons set forth below, Burns' petition is DENIED.

## FACTS

### Burns' Indictment

On October 19, 2004, a grand jury indicted Burns and other co-conspirators.  (Dkt. No. 96: Gov't Letter Br. at 1.)  Four counts of the indictment pertained to Burns.  (Gov't Letter Br. at 1.)   Count one charged Burns with conspiring to distribute fifty grams or more of methamphetamine in violation of 21 U.S.C. § 846; count four charged Burns with distributing and possessing with intent to distribute five grams or more of methamphetamine in violation of 21 U.S.C. §§ 812, 841(a)(1) and (b)(1)(B); count six charged Burns with distributing and possessing with intent to distribute, multi-gallon quantities of gamma butyrolactone ("GBL") in violation of 21 U.S.C. §§ 802(32)(A), 812, 841(a)(1) and (b)(1)(C); and count seven charged Burns with structuring approximately $150,440 in cash transactions in violation of 31 U.S.C. § 5324(a)(3).  (Gov't Letter Br. at 2; see generally Dkt. No. 90: Neuman Aff. ¶ 2; Dkt. No. 90: Burns Aff. ¶ 2.)

### Burns' Proffer Sessions with the Government

Burns attended four proffer sessions with the government: three with his first attorney, Alan Seidler, and the last one with his second attorney, Robert Feldman.  (Dkt. No. 96:

Gov't Letter Br. at 2.)  Prior to attending the proffer sessions, Burns and his first attorney, Alan

Seidler, and A.U.S.A. Steven Feldman signed a proffer agreement stating:

> (2)  In any prosecution brought against [Burns] by this Office, except as provided below the Government will not offer in evidence on its case-in-chief, or in connection with any sentencing proceeding for the purpose of determining an appropriate sentence, any statements made by [Burns] at the meeting, . . . .

> (3)  Notwithstanding item (2) above: . . . (c) the Government may also use statements made by [Burns] at the meeting to rebut any evidence or arguments offered by or on behalf of [Burns] (including arguments made or issues raised sua sponte by the District Court) at any stage of the criminal prosecution (including . . . sentencing) in any prosecution brought against [Burns].

> (4)  [Burns] understands and agrees that in the event [Burns] seeks to qualify for a reduction in sentence under Title 18, United States Code, Section 3553(f) or United States Sentencing Guidelines, Sections 2D1.1(b) (6) or 5C1.2, the Office may offer in evidence, in connection with the sentencing, statements made by [Burns] at the meeting and all evidence obtained directly or indirectly therefrom.

> . . . .

> (9)  [Burns] and Attorney acknowledge that they have fully discussed and understand every paragraph and clause in this Agreement and the consequences thereof.

(Gov't Letter Br. Ex. E: Proffer Agreement ¶¶ 2-4, 9.)

**The Government's Pimentel Letter**

On November 4, 2004, the government provided Burns with a Pimentel letter,

informing Burns of the government's view that Burns' base offense level was 38 and that his offense

level should be increased by two levels based on Burns' role as an organizer, leader, manager or

supervisor.  (Dkt. No. 90: Gov't Letter Br. at 2; see Dkt. No. 90: Neuman Aff. ¶ 6.)  The government,

however, conceded that Burns would be entitled to a three level reduction if Burns clearly accepted

responsibility during his plea allocution.  (Gov't Letter Br. at 2.)  The government concluded that

Burns' Sentencing Guidelines range was 235 to 293 months imprisonment.  (Govt' Letter Br. at 2;

Neuman Aff. ¶ 6.)

**<u>The Guilty Plea Proceeding</u>**

        On November 22, 2004, represented by his second attorney, Robert Feldman, Burns

pleaded guilty before Judge Mukasey to counts one, four, six and seven of the indictment.  (Dkt. No.

39: 11/22/04 Guilty Plea ("P.") 2, 11-15, 28-31.)  Before allocuting, Burns acknowledged that he had

adequately conferred with his defense counsel and was "satisfied with [defense counsel's]

representation."  (P. 8.)  Burns stated that he understood the charges to which he was pleading guilty,

the rights he was waiving, and the maximum sentence he faced.  (P. 9-20.)  Burns stated that he

understood that if he pleaded guilty, the government would have to prove the amount of drugs

involved to Judge Mukasey, rather than to a jury.  (P. 15-17.)  Judge Mukasey explained that the case

was governed by the Sentencing Guidelines, after which the following colloquy occurred:

> THE COURT:  However, even if I determine that there was a basis for going below the low end of the range, in no event could I go below 120 months, that's ten years.  Do you understand that?
>
> THE DEFENDANT:  Yes, your Honor.  Not even with safety valve?
>
> THE COURT:  Good question.  If you qualify for a safety valve adjustment, then I can go below – in other words, if the safety valve changes your guidelines range, so that it comes out below 120 months, then I could go below 120 months. Also, if you qualify for a safety valve adjustment and there is a reason for going below what would otherwise be the minimum under the guidelines, even if it's more than 120 months, if you qualify for a safety valve, I can go below 120 months if there was a reason to depart downward.  But if I did that, the government would have the right – that is, if I depart downward on any basis other than cooperation, the government would have the right to appeal.
>
> Do you understand that?

THE DEFENDANT:  Yes.

[A.U.S.A.] MEDING:  Your Honor, may I note for the record that at this time the government does not believe that the defendant is eligible for the safety valve, both because of his criminal history category and also because it is the government's position that he is an organizer or a manager.

[DEFENSE COUNSEL] FELDMAN:  We do not concede any of that.

THE COURT:  I understand.  You can haggle with the government about that if you need to, and if you need to haggle with me, you can haggle with me.

If the outcome is that you qualify, then you qualify.  But there is no guarantee.  The government is taking the position now that you do not.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

. . . .

THE COURT:  Has anyone at all, Mr. Burns, made any kind of promise or inducement to you in order to get your to plead guilty?

THE DEFENDANT:  Prior to this Pimentel offering that came to me, there was a prosecutor . . . Steven Feldman who was on the case, and I had gone and had three proffer meetings with him, and my lawyer at the time was Alan Seidler, and Mr. Feldman made it very clear that if I lied about anything in those proffer hearings that he would take away my safety valve and use everything against me.  So I told him everything of my involvement, all of the responsibility that I had. . . . I am bringing it up, sir, because at one of my proffer hearings I was told – I was promised 87 months.  I had asked, How can I get out of the MDC detention center and get on with this process because I wanted to get my time over with.  He said you can just sign for 87 months.  And he looked at my lawyer Alan Seidler at the time and said, with safety valve and the three points for acceptance of responsibility, at my base level 32, would bring me down to 87 months.  So in my mind I was thinking that was the worst that I could get was 87 months.  Then all of a sudden we have new assistant . . . U.S. attorneys on the case, and it seems like everything that when I went to proffer has been taken away from me.  What [A.U.S.A.] Feldman promised me is not coming to be at all. . . . There would be no reason for me to go to the proffer meeting other than trying to get the safety valve, and, also, in addition, in hopes to work into

a further cooperation agreement with the government.  I was told if I didn't lie about anything, which I didn't lie about anything at all, within my proffer meetings, that I would get the safety valve.  That was the whole reason for me going there because obviously I am in a load of trouble here.

. . . .

THE COURT:  Obviously, there is going to be some litigation about this later on, but understand, if it turns out that either that promise was not made or that it's not enforceable, I am not going to let you withdraw your plea, even if it turns out that you're not going to get the 87 months and even if it turns out you're going to get the heavier sentence that's in the <u>Pimentel</u> letter or something even heavier than that.

Do you understand that?

THE DEFENDANT:  I understand that, you Honor.

. . . .

THE COURT:  If we have to have a hearing on this, we will have a hearing on it, and we will figure out, or I will figure out what happened.  But even if it comes out after I hear the evidence that I don't rule the way you want me to rule, and the sentence turns out to be higher than you want it to be, I am not going to let you withdraw your plea.

Do you understand that?

THE DEFENDANT:  Yes, your Honor. . . .

(P. 21-26.)  Burns allocuted and pleaded guilty to the four counts of the indictment that pertained to him, but allocuted only to the statutory amounts of drugs. (P. 28-31.)  Judge Mukasey accepted Burns' guilty plea.  (P. 32.)

**Sentencing-Related Proceeding**

 **The Presentence Report**

   On September 9, 2005, the Probation Office issued a Presentence Investigation Report (the "Report" or the "PSR"), which calculated that Burns' highest base offense level was 38 because the offense "involved in excess of 1.5 kilograms of methamphetamine (actual) and approximately 100 gallons of gamma butyrolactone (GBL) . . . [which] when converted to their equivalent weights in marijuana, are equal to approximately 30,000 kilograms of marijuana." (Dkt. No. 96: Gov't Letter Br. Ex. A: Presentence Investigation Report ¶ 85.)  The Report advised a two level increase to 40 because Burns "acted as a[n] organizer or leader of the criminal activity."  (PSR ¶ 88.)  Based on Burns' plea allocution acceptance of responsibility, a 3-level downward adjustment was appropriate, leading to an adjusted offense level of 37.  (PSR ¶¶ 104-05.)  The PSR also stated that Burns had two criminal history points, for "a Criminal History Category of II."  (PSR ¶¶ 109-16.)  Based upon the calculations of Burns' offense level and criminal history category, the PSR concluded that Burns' Sentencing Guidelines range was 235 to 293 months.  (PSR ¶ 153.)

 **Defense Counsel's Sentencing Letters to Judge Mukasey**

   On September 27, 2005, defense counsel Robert Feldman wrote a letter to Judge Mukasey disputing the Report's calculation of Burns' offense level and criminal history category and moving for a downward departure based on Burns' "[d]iminished [c]apacity." (Dkt. No. 67: Burns 9/27/05 Letter at 1; accord, Dkt. No. 90: Neuman Aff. Ex. B: Burns 8/25/05 Letter.)  Specifically, defense counsel argued that Burns' base offense level was 32, pursuant to Section 2D1.1(c)(4), because Burns only pleaded guilty to possessing with intent to distribute fifty grams of crystal

methamphetamine rather than 1.5 kilograms.  (Burns 9/27/05 Letter at 1.)  Defense counsel also disputed the two level increase because Burns never admitted to "acting as a leader or organizer." (Burns 9/27/05 Letter at 1.)  Defense counsel concluded that Burns' offense level should be 29 after reducing the base offense level by three points for Burns' acceptance of responsibility.  (Burns 9/27/05 Letter at 1.)

Regarding Burns' criminal history category, defense counsel "urge[d]" Judge Mukasey to "discount" Burns' April 7, 1993 Criminal Trespass and Simple Assault conviction pursuant to Section 4A1.2(e)(1) because, "[b]y liberal measure and giving [Burns] the benefit of the doubt," it occurred more than ten years before the instant offense.  (Burns 9/27/05 Letter at 1.)  Defense counsel concluded that Burns should only receive one criminal history point and, therefore, the guidelines range was between 97-121 months.  (Burns 9/27/05 Letter at 2.)

Defense counsel requested a downward departure, maintaining that when Burns committed the instant offense, he was taking methamphetamine as a substitute for Adderall, which he had been prescribed to combat his Attention Deficit and Hyperactivity Disorder ("ADHD" or "ADD"), because his insurance had lapsed and he could not afford to purchase Adderall.  (Burns 9/27/05 Letter at 2.)  Defense counsel argued:

> When [Burns] lost his health insurance, he was unable to procure the Adderall and was compelled to self medicate with illegal methamphetamine to substitute for the legally prescribed amphetamine based Adderall. . . . In that sense [Burns'] crystal meth use was not voluntary.  In Dr. Kaplan's [the psychologist hired by Burns] unchallenged profession opinion "that [Burns] was compelled to 'self medicate' and therefore his drug use was not completely voluntary" pursuant to Section 5K2.13(par 2).  In short, in order for [Burns] to function and work and earn a living, he needed the meth to focus his wandering ADHD inflicted mind.

(Burns 9/27/05 Letter at 2-3.)   Defense counsel further argued that Burns' post-traumatic stress disorder, stemming from sexual abuse during childhood, and two prior concussions exacerbated the negative affects arising from his addiction to methamphetamine.  (Burns 9/27/05 Letter at 2-3.)

Defense counsel "anticipate[d] that the government will point out that diminished capacity cannot result from or should not result from the voluntary ingestion of illegal drugs or other intoxicants. . . . [B]y the time the offense was committed, the question of whether the ingestion of drugs was voluntary or not, even in the light most favorable to the government, is at best open and debatable."  (Burns 9/27/05 Letter at 3.)

On November 16, 2005, defense counsel supplemented his initial letter with a second letter, which clarified why Burns' April 7, 1993 conviction should not be counted towards his criminal history.  (See Dkt. No. 69: Burns 11/16/05 Letter at 1-2.)  Defense counsel also argued that the government acted in "bad faith" by not submitting a 5K1.1 letter and thus, "[a]t the very least, [Burns] should have the benefit of the 5C1.2 safety valve limit on the Statutory Minimum."  (Burns 11/16/05 Letter at 2.)  Defense counsel reiterated his argument for a downward departure.  (Burns 11/16/05 Letter at 2-4.)

**The Government's Sentencing Response Letter**

On November 28, 2005, the government responded, arguing that the Probation Department accurately calculated Burns' guidelines range.  (Dkt. No. 70: Gov't 11/28/05 Letter at 6.) Specifically, the government argued that 38 was the appropriate guidelines offense level because:

Burns told Dr. Seigel that he purchased approximately 12 pounds (5,443 gm) of crystal methamphetamine.  Even assuming the crystal methamphetamine was only 50% pure (a very low level of purity), this would still total approximately 2.72 kg of

methamphetamine (actual).  Level 38  applies to any amount of drug in excess of 1.5 kg of methamphetamine (actual).  The guidelines also provide that 1 gm of methamphetamine (actual) is equal to 20 kg of marijuana.  2,721 gm of methamphetamine (actual) is equivalent to 54,420 kg of marijuana.

In addition, based on the GBL seized from the Harlem basement, Burns was involved with more than approximately 100 gallons of GBL.  The Sentencing Guidelines provide that .5 gm of GBL constitute one "unit."  Accordingly, Burns possessed with intent to distribute approximately 757,000 units of GBL.  See U.S.S.G. § 2D1.1, Note (F) to the drug quantity table.  757,000 units of GBL is equivalent to 757 kg of marijuana.

In total, Burns is responsible for in excess of 55,177 kg of marijuana.  Level 38 applies to an amount of marijuana in excess of 30,000 kg.  Accordingly, level 38 applies.

(Gov't 11/28/05 Letter at 11.) The government also argued that Burns "failed to present evidence that he was suffering from a significantly reduced mental capacity at the time he committed the offenses of conviction, or that his mental health issues caused him to distribute drugs." (Gov't 11/28/05 Letter at 6; see also id. at 6-11.)

**The November 30, 2005 Sentencing Hearing**

On November 30, 2005, Judge Mukasey held a sentencing hearing.  (Dkt. No. 58: 11/30/05 Sentencing Hearing ("S.").)

At Judge Mukasey's request, the government provided a number of examples allegedly showing Burns' leadership role (S. 3-5), but Judge Mukasey responded that "[s]o far you have pointed to one, that's Harrison, who sold drugs on [Burns'] behalf.  You pointed to a number of people who got a package for him that he eventually got; doesn't sound terribl[y] organizational to me, but why don't we hear about Harrison, [defense counsel] Robert Feldman." (S. 5.)  Defense counsel argued that Harrison was Burns' "good friend," "customer" and "co-drug addict," but that

Harrison never worked for Burns.  (S. 6.)  The government responded that, during the proffer sessions, Burns stated that a supplier would send packages to Harrison and that Harrison would pass on the packages to Burns.  (S. 8.)  Additionally, the government noted that Harrison "was selling to his own customers, as well as Randy Hall, toward the end, and Mr. Burns describe[d] Mr. Hall as somebody who had been a customer of Burns prior to that time."  (S. 8.)  Judge Mukasey replied, "I still don't understand how that makes Mr. Burns an organizer." (S. 8.)  The government responded that Harrison sold drugs on Burns' behalf and split the proceeds with Burns.  (S. 8-9.)  Defense counsel, however, retorted that "there was no splitting of any proceeds." (S. 9.)  Rather, defense counsel maintained that Burns fronted Harrison drugs, and Harrison would pay Burns back at a later time.  (S. 9.)  The government offered another example, where Burns and Harrison picked up a package from a hotel and Burns took a portion of the drugs for himself and then "sent Mr. Harrison on his way with the rest of the drugs to sell." (S. 9-10.)  Defense counsel, however, replied that "they went to pick up drugs together at the hotel, Harrison took a portion of the drugs to sell to his customers and Burns took a portion of the drugs to sell to Burns' customers.  They were co-conspirators, they were not boss. . . ."  (S. 10.)

Judge Mukasey asked defense counsel if he wanted an evidentiary hearing on whether Burns had a leadership role, with respect to Harrison's conduct. (S. 10-11.)  Defense counsel replied, "if I don't ask you for a hearing, will you find him to be a leader?"  (S. 11.)  Judge Mukasey responded:  "The short answer to that is I don't know.  It's the most honest answer I can give you," and again asked if the defense wanted a hearing.  (S. 11.)  After conferring with Burns, defense counsel declined to request a hearing.  (S. 11-12.)

Judge Mukasey stated:

Then why don't I tell you where we are at this point, and when I say I don't
know, I want to go take a look at a few things before I resolve that finally.

Number one, I think his criminal history category, that is his history as
computed in the PSR, overrepresents the likelihood of recidivism, particularly when
you have one offense that is really right on the cusp and no one is precisely sure of
where it falls, as a result of which I will give him the benefit of the doubt on that. . . .
such that the Criminal History is Category I rather than II.

. . . .

I think it's close enough that it overrepresents the likelihood of recidivism.
There may be other issues that relate to recidivism, but certainly the criminal history
in and of itself is overrepresented if you count that offense.  So it's now a level one.

Now on the issue of quantity, there the government's proffer and certainly the
proof, . . . is quite sufficient.  The fact that he simply admitted to certain things
during the allocution doesn't change what really happened.  And I'm supposed to go
on the basis of what happened, not simply on the basis of what he said at the time of
the allocution.  If you want a hearing on quantity, I'll give you that, too.

. . . .

That is where I am.  I want to consult some more authority on the issue of his
leadership role as I heard about it today before I make a decision on that, but that's
where we are.

(S. 2-13, 15.)

Defense counsel argued that the government's refusal to file a 5K1 letter on Burns'

behalf was "disingenuous[]" because Burns' proffers occurred so "serendipitously close" to when the

individuals, who Burns spoke about during the proffers, were arrested.  (S. 16-17; see also S. 18-20.)

The government responded that it "didn't use Mr. Burns' information.  We had questions about Mr.

Burns' reliability.  We didn't sign him up.  We weren't going to go in the grand jury or anywhere and

proffer the information without knowing we would have a witness. We just don't do that. We didn't make any cases based on Burns' information." (S. 21.) The government averred that it utilized other cooperators and wiretaps to arrest the individuals that Burns spoke about during the proffers. (S. 21.)

The following colloquy occurred:

THE COURT: Again, I don't second guess these things. Also I should point out that 5K1.1 is phrased in terms of substantial cooperation, it's not phrased in terms of tips. And I don't see any reason for me to second guess the decision here. I think the government is generally the best guardian of its own interest, and I don't see any reason to usurp that, . . .

[DEFENSE COUNSEL] ROBERT FELDMAN: I see your point, Judge, but that raises the big SV word. Do those proffer notes that you see in front of your Honor, along with the dates of the arrest that follow thereafter, open them up to a safety valve? My answer is strongly morally and beggingly, yes.

If they proffer once and they're full of it, they don't get brought back a second time, third time and fourth time.

THE COURT: As I understand it, these sessions were – a number of them were principally at the insistence of counsel, not at the insistence of the government.

MR. ROBERT FELDMAN: Just one, that was November 9th, that was me.

. . . .

[A.U.S.A.] STEVEN FELDMAN: Your Honor, it's our view that he doesn't qualify for the safety valve because, one, the criminal history that he had the two points, two, because of leadership role–

THE COURT: Leadership role I haven't resolved. The other points I have, and it's not going that way.

[A.U.S.A.] STEVEN FELDMAN: And three, we did have real doubts as to Mr. Burns' candidness on a number of questions, including, for example, his relationship with Mr. Harrison. He described himself as a broker. This, of course, is not going to open up. If Mr. Feldman is going to now argue that what Mr. Burns

said at all his proffers is for safety valve purposes, that brings all the proffer notes in as well, but that's a different issue for us to talk about.

> THE COURT: Well, let's talk about it. . . .

> I wasn't there for the proffer, so I don't know what happened, I don't know what the risks are of proceeding down this road. You do, you're the lawyer, so the question is: Do you want to go down there or not?

> MR. ROBERT FELDMAN: Yeah, we want to go down that road.

(S. 22-25.)  The government explained that it believed that Burns had a leadership role because during Burns' proffers, Burns stated that a "West Coast Supplier" sent packages to former guests at two Chelsea hotels and the managers accepted the packages for Burns in exchange for crystal methamphetamine. (S. 25-26, 28.)  Burns also proffered that Randy Hall agreed to accept a package from Arizona for Burns on the condition that Hall could take one-half pound of the three pounds in the package.  (S. 26.)   Burns also stated that he had ketamine sent to Hall.  (S. 26.)   Burns additionally proffered that he gave Frank Hogan $40,000 in cash and Hogan wrote Burns a check to "launder the money."  (S. 26-27.)  Burns also proffered that Chris Pigano accepted packages of GBL for Burns, that Pigano and two other individuals helped Burns bottle the GBL, and another individual stored the GBL in his Harlem basement for Burns.  (S. 27-29.)

The following colloquy occurred:

> MR. ROBERT FELDMAN:   . . . [Burns] didn't lead Dan Harrison, didn't lead the hotel guy, didn't lead anybody.  Yes, they conspired together, and that's what my client pled guilty to. . . .

> [A]s far as the Chris Pigano proffer, Chris Pigano and my client at the time were boyfriends.  They . . . lived together, they spent . . . almost every night together. They were co-drug addicts, . . . They weren't in leadership, . . . these were boyfriends, . . . they weren't leaders, they weren't bosses and employees. . . .

Putting the drugs up in Harlem in this storage facility, . . . [m]y client paid the owner of the Brownstone to use it as a storage facility.  He didn't boss him, he didn't lead him, he didn't organize him.  The guy got money from lot of people to store stuff in a big basement.

As far as the bottle of the GBL – the GHB in Scope bottles, my client did that. He sold ten ounce bottles to Randy and Chris for a hundred bucks, and Randy and Chris sold them for a huge amount above a hundred. . . . My client didn't organize it, he didn't share in the proceeds, he didn't lead these people.  They were his . . . customers getting this at a really reduced rate.

And finally, . . . Chris Didero . . . was a friend of my client who helped hide [the GBL] in the back of the basement.  He didn't lead him, he didn't organize him, he didn't pay him, he wasn't an employee.  These are co-conspirators, . . . not bosses and employees.

THE COURT: But in each of these transactions you will concede your client is at the apex as the source of the material that is being bottled or stored or distributed or provided.

MR. ROBERT FELDMAN:  I will concede that he managed to buy a large amount of the GBL, legally, . . . And when you say apex, he is the one that distributed them to these other people.

THE COURT:  Only in the sense that if he doesn't provide the material, they don't have it.

MR. ROBERT FELDMAN:  He sold it to them, they were customers.

THE COURT:  I understand your point of view.  I will consider it.

(S. 29-31.)

After the colloquy, defense counsel addressed his request for a downward departure due to decreased mental capacity.  (S. 31.)  Defense counsel proffered that Burns' father, who is a child psychologist, would testify that Burns was a "damaged baby from the day that he was born." (S. 32.)  The government accepted defense counsel's proffer.  (S. 32.)  Defense counsel argued for

a downward departure due to diminished capacity because Burns suffered from "uncontroverted" ADD, post-traumatic stress stemming from sexual abuse and had two concussions as a child. (S. 33-34.) Defense counsel also explained that Burns took prescription Adderall to relieve his symptoms, but that when Burns got fired, "his insurance ran out, and that's when he began dabbling in crystal. As . . . Dr. Kaplan pointed out, the drug use, the crystal use after the Adderall money ran out was not entirely voluntary.  In order for him to function . . . as a normal productive citizen with a job, he had to focus his mind, and the Adderall running out left him no choice but to . . . self-medicate with the crystal meth."  (S. 34-35.)

Defense counsel also argued that a guidelines sentence was not proportional to Burns' crime:

> MR. ROBERT FELDMAN:  . . . [T]here's a concept of proportionality. . . . [I]n 25 years as a legal aid lawyer, an 18(b) lawyer, as a private lawyer . . . , every single huge drug dealer that I plead guilty gets eight or less.
>
> THE COURT:  Talking about across the street?
>
> MR. ROBERT FELDMAN:  Yes.
>
> THE COURT:  . . .[M]y standard response is that when you leave the courthouse today and look back over your shoulder, you'll see it says United States Courthouse over the lintel, it doesn't say what it says across the street, . . .
>
> MR. ROBERT FELDMAN: I just pointed it out in terms of ethics and morality. . . . [I]t's just a matter of how much jail a young person, who is such a bad drug addict, who was so like wrapped up in this whole sexual party and play crap, . . . that deserves to go to jail for so many years.  His family is so supportive.  He obviously needs one of those 18 month inpatient drug programs.

(S. 38-39.)  Defense counsel concluded:

> What I'm asking you to do, in summary, Judge, . . . is . . . to give [Burns] the safety valve, because you have the four proffers in front of you.  He has no reason to lie. . . . He was straightforward, he provided good information.  And I ask that you come down off of the ten in some way.  Because the way this statutory cases work with diminished capacity is the judge decides how much diminished capacity contributed to it: . . .
>
> I ask that you find X amount of diminished capacity, that he was so straightforward, the fact that they brought him back three times voluntarily, one time with me begging them, that you look, you weigh it, and you come up with a number in your heart that feels fair.

(S. 40.)

Judge Mukasey adjourned the hearing by stating:  "[y]our client is fortunate in one respect, that is he has a good lawyer.  This one was very persistent."  (S. 41.)

### The December 6, 2005 Sentencing Hearing

On December 6, 2005, Judge Mukasey resumed Burns' sentencing hearing.  (Dkt. No. 79: 12/6/05 Sentencing Hearing ("S2.").)  On the issue of whether Burns should receive a two point "upward adjustment" as an "'organizer, leader, manager or supervisor," Judge Mukasey decided:

> [I]t is undeniable that as the source of drugs, [Burns] was the one who decided when shipments would arrive, he arranged the times with others to receive them and forward them to him so that he could distribute them to others, including others who would resell, and that he arranged for the placement of drugs into bottles by recruiting others to do the bottling so that the drugs could be distributed.
>
> He also arranged to store a large quantity of drugs before they could be broken down into smaller quantities for distribution.
>
> Although defense counsel argues that Burns did not "boss" or "lead" or "organize" people he dealt with, the fact remains because he was the source of the drugs, he controlled the timing and circumstances of their distribution and storage.
>
> . . . .

> This defendant . . . performed an organizational function perhaps inherent in his role as the source of drugs for others.  The enhancement for a leadership role in the offense was proper.

(S2. 2-3, record citations omitted.)

Judge Mukasey also denied defense counsel's request for a downward departure due to diminished capacity because of "a dearth of facts in the record to establish that this defendant's capacity was diminished in a way that significantly interfered with his ability to function or contribute to the sale of drugs." (S2. 3.)  Judge Mukasey noted that Burns sold drugs "in quantities far beyond" what was "necessary to feed a drug habit" and that Burns used methamphetamine even when he had Adderall available to him to treat his ADD.  (S2. 4.)

Judge Mukasey also stated that there was "no evidence whatever of bad faith by the government in declining to move for a downward departure pursuant to Section 5K1.1 of the sentencing guidelines.  That section speaks of a government motion based on 'substantial assistance.'  Tips, except in a highly unusual case, do not constitute 'substantial assistance.'"  (S2. 4)

Judge Mukasey concluded that Burns was not entitled to a safety valve adjustment because he received an enhancement for his leadership role, and that "the total offense level allowing for acceptance of responsibility is 37, the criminal history category of I which yields a range of 210 to 260 months."  (S. 4.)

Defense counsel argued that Burns' guidelines level should be 32 because there was no proof of 1.5 kilograms of methamphetamine, but only proof of the fifty grams that Burns admitted to in his plea allocution.  (S2. 5.)  The following colloquy occurred:

[DEFENSE COUNSEL ROBERT] FELDMAN:  Based on your Honor's finding of 1.5 kilograms or more, you found it when you said 210 – am I wrong?

THE COURT:  I got it based on a proffer.  I wasn't there.

Do you want a hearing?

MR. R[OBERT] FELDMAN:  Yes, sir. . . .

[A.U.S.A.] STEVEN FELDMAN:  . . . . I just want to remind [Burns] if he is going to frivolously contest things like quantity given he already proffered it, he puts in jeopardy his responsibility points as well and he should consider that in going forward in this manner.

In this case he proffered to Dr. Siegel that he obtained approximately 12 pounds from California, he proffered to myself and the agents in detail and we have the [proffer] notes, some of which defense counsel provided to you, we have 100 gallons of GPL that we seized from a house in Harlem. . . .

THE COURT:   . . . What is your pleasure? . . .

MR. R[OBERT] FELDMAN:   . . . [Y]our finding of over 1.5 kilograms was based on what, your honor?

THE COURT: It is based on what I had heard from the government as to what was in your client's proffer, as to what they could prove.  It's based on what I just heard.

If you think that's not enough, then you are entitled to a hearing.

I ask again, do you want a hearing?

MR. R[OBERT] FELDMAN: [I]t's only 11 months old, my maybe faulty understanding of the new ambiance in which we are working.  Is that a way these enhancements have to be proven beyond a reasonable doubt?

THE COURT:  Only if they increase the mandatory minimum or if they increase the maximum, in other words if they do something under the statute, and the government has already taken the position that they are not asking for anything beyond a ten year mandatory minimum, which is well below the guideline range.

MR. R[OBERT] FELDMAN:  When you say 210 months - -

THE COURT:  That is the guideline range.

MR. R[OBERT] FELDMAN: And you have to consult that, but you don't have to follow it?

THE COURT:   That's correct.  But, I mean, I don't want you to draw any conclusions than I should from the fact you smiled when you said I have to consult it and not follow it.

I said the last time and I will say it again that the guidelines represent the collective wisdom, . . . of all the judges that have been doing sentencing in these matters since before the guidelines were passed.  I am required to consult it, I am also required to take it seriously and I will.

(S2. 6-8.)  After that colloquy, defense counsel consulted with Burns and declined a hearing.  (S2.

8-9.)  Defense counsel made the following final plea:

We are asking for you to do what your big heart desires.  I know that you said it's not a cardiac experience and I understand this is a discipline and I understand this is federal court . . . , but at the same time we are all human and this is one human case . . . where . . . in my gut and my little heart, can't see a huge sentence. . . .

The eight years, Judge, that he would be entitled to if he was truthful, which he totally . . . was, but you found he was a leader, you knocked that out.  He was so truthful, because he wasn't scared of any of these people.

And your Honor said he was the apex . . . , but he wasn't.  [W]e have Yvonne Spitz who was the apex.  She supplied it to him.  Okay?

So if the government did what they should be doing, . . . it just seems to me you try to get the supplier. . . . And it was so easy since Yvonne had not met [Burns] and [Burns] call her on the phone and come to the Christmas party like I did last year, the next step, I would like to stop over for the Christmas party, with the agent could have been and gotten the biggest supplier that . . . agent Subach knows of in the United states, . . . but they choose not to.  And [the A.U.S.A.] told me they chose not to because . . . he didn't think [Burns] was being truthful, where the truth of the matter was [Burns] was as truthful as he could possibly be . . . .

. . . .

As his father said, he was damaged form the day he was born.

You already said you won't find a diminished capacity, but I am asking you look at what you mistakenly said little cardiac piece and see that he deserves the least possible that you can legally give him. . . . And follow or included therein 18 month drug program.  He still, in my somewhat experienced opinion, is yearning for drugs every minute of the day.

(S2. 9-11.)

Judge Mukasey announced that he would "go off guidelines slightly, but not substantially, because, in large measure, of the nearness of some of the determinations that made it impossible for Mr. Burns to get an adjustment," and sentenced Burns to 180 months imprisonment (30 months below the low end of the 210 to 260 months guidelines calculated by Judge Mukasey, and even further below the 235 to 293 months calculated by the Probation Department in the Presentence Report), followed by five years of supervised release.  (S2. 12-13; see Gov't Letter Br. Ex. A: PSR at 7.)  Judgment was entered on January 19, 2006.  (Dkt. No. 80: Judgment.)

**Burns' Direct Appeal**

Burns timely filed a notice of appeal on December 13, 2005.  (Dkt. No. 81.)  On January 9, 2007, the Second Circuit approved the stipulation between the government and Burns to withdraw Burns' appeal, so that he could bring ineffective assistance of counsel claims in the district court.  (Dkt. No. 85: Stipulation Withdrawing Appeal; see also Dkt. No. 90: Neuman Aff. ¶¶ 10-14; Dkt. No. 96: Gov't Letter Br. at 3.)

## Burns' 28 U.S.C. § 2255 Motion

On September 7, 2007, Burns filed a petition pursuant to 28 U.S.C. § 2255 to vacate his sentence.  (07 Civ. 7870, Dkt. No. 1: Pet.)  Burns' § 2255 motion asserts that:  (1) Burns' first attorney, Alan Seidler, was ineffective for failing to "advise [Burns] of the risks of participating in proffer sessions"; and (2) Burns' second attorney, Robert Feldman, was ineffective for "inexplicably neglect[ing]" to "argue that the court could consider [Burns'] efforts at cooperation when imposing sentence, even though the government declined to submit a 5K letter."  (Pet. ¶¶ 12(A)-(B); see also Dkt. No. 90: Neuman Aff. ¶ 16; Dkt. No. 90: Burns § 2255 Br.)

With respect to the first claim, as to attorney Seidler, Burns and Seidler submitted contradictory affidavits as to what Seidler had advised Burns.  (Compare Dkt. No. 90: Burns 11/28/07 Aff. ¶¶ 4-6, 8-10, with Dkt. No. 96: Gov't Letter Br. Ex. D: Seidler Aff. ¶¶ 2-4.)  Because of these conflicting affidavits, this Court scheduled a hearing solely to address Burns' claim that counsel Seidler failed to properly advise Burns as to the consequences of proffering to the government.  (07 Civ. 7870, Dkt. Nos. 9-12.)  The day before the hearing, Burns' counsel withdrew, with prejudice, Burns' first § 2255 claim as to counsel Seidler.  (07 Civ. 7870, Dkt. No. 13: Neuman 12/1/08 Letter to Court.)[3/]

--------

[3/]     Burns' counsel's letter stated:

> I write to inform you that my client, Joseph Burns, hereby withdraws that aspect of his § 2255 petition which pertains to the allegations of ineffective assistance of trial counsel against Alan Seidler, Esq., thereby obviating the need for the hearing, scheduled for December 2, 2008. . . .

(continued...)

## ANALYSIS

**I.     THE <u>STRICKLAND</u> V. <u>WASHINGTON</u> STANDARD ON INEFFECTIVE ASSISTANCE OF COUNSEL**

In <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective:  "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Id</u>. at 687, 104 S. Ct. at 2064.[4/]  This performance is to be judged by an objective standard of reasonableness.  <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 688, 104 S. Ct. at 2064.[5/]

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time . . . .  [A] court must indulge a strong presumption that counsel's conduct

---

[3/]     (...continued)

> To be clear, Mr. Burns understands that this withdrawal is "with prejudice" and final, insofar as it concerns the allegations against Mr. Seidler.  He still wishes to pursue, however, the allegations of ineffective assistance against Mr. Robert Feldman. . . .

(<u>Id</u>.)

[4/]     <u>Accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); <u>Bell</u> v. <u>Miller</u>, 500 F.3d 149, 156-57 (2d Cir. 2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d 48, 62-63 (2d Cir. 2005), <u>cert. denied</u>, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[5/]     <u>Accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 521, 123 S. Ct. at 2535; <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 695, 122 S. Ct. 1843, 1850 (2002); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 63.

falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[6]

Second, the defendant must show prejudice from counsel's performance.  Strickland v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064.  The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."  Id. at 695, 104 S. Ct. at 2068-69.  Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S. Ct. at 2068.[7]

---

[6]   Accord, e.g., Bell v. Cone, 535 U.S. at 698, 122 S. Ct. at 1852; Bell v. Miller, 500 F.3d at 156-57; Henry v. Poole, 409 F.3d at 63; Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

[7]   See also, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bell v. Cone, 535 U.S. at 695, 122 S. Ct. at 1850; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 128 S. Ct. 85 (2007); Henry v. Poole, 409 F.3d at 63-64; Aparicio v. Artuz, 269 F.3d at 95; Sellan v. Kuhlman, 261 F.3d at 315; DeLuca v. Lord, 77 F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068; accord, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542.  The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not."  Strickler v. Greene, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53 (1999); Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland"); Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have
(continued...)

The Supreme Court has counseled that these principles "do not establish mechanical rules." Strickland v. Washington, 466 U.S. at 696, 104 S. Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. Id.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland v. Washington, 466 U.S. at 695-96, 104 S. Ct. at 2069); accord, e.g., Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991).

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. at 697, 104 S. Ct. at 2069.[8]

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . .  In any

---

[7]    (...continued)
determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." Strickler v. Greene, 527 U.S. at 291, 119 S. Ct. at 1953; cf. id. at 297-301, 119 S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

[8]    Accord, e.g., Smith v. Robbins, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000).

ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066.[9/]

As the Second Circuit noted:  "The Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d at 199; accord, e.g., Bell v. Miller, 500 F.3d at 156-57.

**A.      Strickland Applies to Ineffective Assistance Claims Arising Out of A Guilty Plea or at Sentencing**

The Strickland standard also applies to ineffective assistance claims arising out of a guilty plea. Hill v. Lockhart, 474 U.S. 52, 58, 106 S. Ct. 366, 370 (1985).[10/]  "In the context of a guilty plea, the prejudice requirement 'focuses on whether counsel's constitutionally ineffective

---

[9/]     See also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing Strickland claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), cert. denied, 513 U.S. 820, 115 S. Ct. 81 (1994).

[10/]    See, e.g., Wright v. Van Patten, -- U.S. --, 128 S. Ct. 743, 746 (2008); United States v. Doe, 537 F.3d 204, 213-14 (2d Cir. 2008); United States v. Jennings, 282 Fed. Appx. 37, 38 (2d Cir. 2008); United States v. Arteca, 411 F.3d 315, 320 (2d Cir. 2005);  United States v. Thomas, 74 Fed. Appx. 113, 115 (2d Cir. 2003), cert. denied, 541 U.S. 1019, 124 S. Ct. 2089 (2004); United States v. Couto, 311 F.3d 179, 187 (2d Cir. 2002), cert. denied, 544 U.S. 1034, 125 S. Ct. 2283 (2005).

performance affected the outcome of the plea process. In other words, in order to satisfy the

"prejudice" requirement, the defendant must show that there is a reasonable probability that, but for

counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" Moore

v. United States, 00 Civ. 4560, 98 Cr. 833, 2001 WL 253432 at *11 (S.D.N.Y. Mar. 15, 2001) (Peck,

M.J.) (quoting Hill v. Lockhart, 474 U.S. at 59, 106 S. Ct. at 370).[11/]

       Where the petitioner's claim is that counsel was ineffective at the time of sentencing,

Strickland applies, and the second prong (prejudice) requires a showing that there is a reasonable

probability that, but for counsel's error, the result of sentencing would have been different, that is,

the petitioner would have received a lesser sentence. E.g., United States v. Workman, 110 F.3d 915,

920 (2d Cir.), cert. denied, 520 U.S. 1281, 117 S. Ct. 2469 (1997).[12/]

---

[11/]    Accord, e.g., United States v. Doe, 537 F.3d at 214; United States v. Arteca, 411 F.3d at 320; United States v. Garcia, 57 Fed. Appx. 486, 489 (2d Cir.), cert. denied, 538 U.S. 992, 123 S. Ct. 1815 (2003); United States v. Couto, 311 F.3d at 187; United States v. Coffin, 76 F.3d 494, 498 (2d Cir.), cert. denied, 517 U.S. 1147, 116 S. Ct. 1445 (1996); Tate v. Wood, 963 F.2d 20, 26 (2d Cir. 1992); Ventura v. Meachum, 957 F.2d 1048, 1058 (2d Cir.1992); Panuccio v. Kelly, 927 F.2d 106, 108 (2d Cir. 1991); Heyward v. Costello, 91 Civ. 1570, 1994 WL 263426 at *3-4 (S.D.N.Y. June 13, 1994); People v. McDonald, 1 N.Y.3d 109, 115, 769 N.Y.S.2d 781, 785 (2003).

[12/]    See, e.g., Blumenberg v. United States, 05 Civ. 9416, 01 Cr. 571, 2008 WL 1944012 at *2 (S.D.N.Y. Apr. 30, 2008); Ahmed v. United States,05 Civ. 7656, 2006 WL 328339 at *9 (S.D.N.Y. Feb. 14, 2006); Fuse v. United States, 04 Civ. 7986, 2005 WL 2173743 at *1-2 (S.D.N.Y. Sept. 7, 2005); Santiago-Diaz v. United States, 299 F. Supp. 2d 293, 299-301 (S.D.N.Y. 2004); Hall v. United States, 01 Civ. 7525, 99 CR. 794, 2002 WL 31357780 at *1-2 (S.D.N.Y. Oct. 17, 2002); Luyanda v. United States, 95 Civ. 3797, 91 CR. 49, 1995 WL 450488 at *2 (S.D.N.Y. July 28, 1995), aff'd, 100 F.3d 945 (2d Cir. 1996).

## II.   BURNS' CLAIM THAT HIS SECOND ATTORNEY WAS INEFFECTIVE FOR FAILING TO ADDRESS THE 18 U.S.C. § 3553 FACTORS IS DENIED

Burns claims that his second attorney, Robert Feldman, was ineffective for failing to "address the statutory factors set forth in 18 U.S.C. § 3553(a),"[13]  particularly Burns' cooperation with the government notwithstanding the government's refusal to file a 5K1 letter.  (Dkt. No. 90: Burns § 2255 Br. at 16.)  Burns maintains that his counsel failed to raise the above arguments

---

[13]      18 U.S.C. § 3553(a) provides, in part:

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed--

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range established for--

(A)  the applicable category of offense committed by the applicable category of defendant as set forth in the [sentencing] guidelines-- . . . .

because his counsel did not "appreciate that the Sentencing Guidelines were now considered merely advisory" under United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005).  (See Burns § 2255 Br. at 16.)[14/]

> In Kimbrough v. United States, 128 S. Ct. 558 (2007), the Supreme Court stated:
>
>> [18 U.S.C. § 3553] as modified by Booker, contains an overarching provision instructing district courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant."  The statute further provides that, in determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  In sum, while the statute still requires a court to give respectful consideration to the Guidelines, Booker "permits the court to tailor the sentence in light of other statutory concerns as well."

Kimbrough v. United States, 128 S. Ct. at 570 (citations omitted).  A district court may consider as part of the 18 U.S.C. § 3553(a)(1) "history and characteristics" factor a defendant's cooperation with the government notwithstanding the government's refusal to file a 5K1 letter.  See, e.g., United States v. Fernandez, 443 F.3d 19, 33 (2d Cir.) ("We agree that in formulating a reasonable sentence a sentencing judge must consider 'the history and characteristics of the defendant' within the meaning of 18 U.S.C. § 3553(a)(1), . . . and should take under advisement any related arguments, including

---

[14/]   In United States v. Booker, the Supreme Court held that the mandatory nature of the federal sentencing guidelines violated the Sixth Amendment and excised the provision of the statute, 18 U.S.C. § 3553(b)(1), that rendered the guidelines mandatory.  543 U.S. at 226-27, 245, 125 S. Ct. at 746, 756-57.

the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1."), cert. denied, 549 U.S. 882, 127 S. Ct. 192 (2006); United States v. Murray, 02 Crim. 1214, 2005 WL 1200185 at *3 (S.D.N.Y. May 20, 2005) (Defendant's "cooperation with the Government (while not in the Government's view sufficient to warrant a motion pursuant to 5K1.1 and thus warranting a departure) is now something that the Court may consider along with all the other factors in § 3553(a).").

Burns' claim that counsel was ineffective for failing to address the 18 U.S.C. § 3553(a) factors, including Burns' cooperation with the government, is refuted by the record. Both at the November 30, 2005 sentencing hearing and again at the end of the December 6, 2005 sentencing hearing, Burns' counsel specifically urged Judge Mukasey to consider Burns' cooperation with the government, notwithstanding the government's refusal to file a 5K1 letter. (See pages 12-13, 20 above.) Burns' counsel stated:

> The eight years, Judge, that he would be entitled to if he was truthful, which he totally . . . was, but you found he was a leader, you knocked that out. He was so truthful, because he wasn't scared of any of these people.
>
> And your Honor said he was the apex . . . but he wasn't. [W]e have Yvonne Spitz who was the apex. She supplied it to him. Okay?
>
> So if the government did what they should be doing, . . . it just seems to me you try to get the supplier. . . . And it was so easy since Yvonne had not met [Burns] and [Burns] call her on the phone and come to the Christmas party like I did last year, the next step, I would like to stop over for the Christmas party, with the agent could have been and gotten the biggest supplier that . . . agent Subach knows of in the United States, . . . but they choose not to. And [the A.U.S.A.] told me they chose not to because . . . he didn't think [Burns] was being truthful, where the truth of the matter was [Burns] was as truthful as he could possibly be, . . .

(See page 20 above.)

Burns' counsel also addressed the § 3553(a)(1) "history and characteristics" factor. In his September 27, 2005 sentencing letter and again at the sentencing hearing, Burns' counsel argued that Burns' post-traumatic stress disorder, stemming from sexual abuse during childhood, and two prior concussions, exacerbated the negative affects arising from his addiction to methamphetamine. (See pages 9, 16 above.)  During the sentencing proceedings, Burns' counsel proffered that Burns' father, who was a child psychologist, would testify that Burns was "a damaged baby from the day that he was born" and that Burns' family was supportive.  (See pages 15-16 above.)  Burns' counsel also argued (unsuccessfully) that at the time of the crime, Burns was taking methamphetamine as a substitute for prescription Adderall, for his Attention Deficit and Hyperactivity Disorder.  (See pages 8-9, 16 above.)

Burns' counsel additionally urged Judge Mukasey to impose a sentence that reflected the requirements of § 3553(a)(2).  Although Burns' counsel did not utilize § 3553(a)(2)'s "need for the sentence imposed" language or mention the factors listed under § 3553(a)(2), Burns' counsel requested that Judge Mukasey impose a sentence "proportional[]" with Burns' crime.  (See pages 16, 20 above.)  During the November 30, 2005 sentencing hearing, Burns' counsel stated:

> [T]here's a concept of proportionality. . . . [I]n 25 years as a legal aid lawyer, an 18(b) lawyer, as a private lawyer . . ., every single huge drug dealer that I plead guilty gets eight or less.  . . .
>
> I just pointed it out in terms of ethics and morality. . . .[I]t's just a matter of how much jail a young person, who is such a bad drug addict, who was so like wrapped up in this whole sexual party and play crap, . . . that deserves to go to jail for so many years.  His family is so supportive.  He obviously needs one of those 18 month inpatient drug programs.

(See page 16 above.)  Defense counsel concluded the November 30, 2005 sentencing hearing by pleading for mercy:

> And I ask that you come down off the ten [years] in some way. . . . [T]hat you look, you weigh it, and you come up with a number in your heart that feels fair.

(See page 17 above.)  Defense counsel concluded the December 6, 2005 sentencing hearing by stating:

> We are asking you to do what your big heart desires.  I know that you said it's not a cardiac experience and I understand this is a discipline and I understand this is federal court . . ., but at the same time we are all human and this is one human case [where] in my gut and my little heart, can't see a huge sentence. . . .
>
> . . . .
>
> You already said you won't find a diminished capacity, but I am asking you look at what you mistakenly said little cardiac piece and see that he deserves the least possible that you can legally give him.

(See pages 20-21 above.)[15]

Despite the above evidence, Burns maintains that his counsel was ineffective for failing to "ever refer to 18 U.S.C. § 3553(a)." (Burns § 2255 Br. at 20.)  Judge Mukasey and defense counsel, however, demonstrated and indeed specifically stated their understanding of the advisory nature of the Sentencing Guidelines.  (See, e.g., page 20 above, where defense counsel said and Judge Mukasey agreed that he has to consult the Sentencing Guidelines but is not required to follow

---

[15]   Additionally, although not specifically referencing § 3553(a)(2)(D)'s provision that a defendant's sentence should provide "needed . . . medical care," Burns' counsel requested that Judge Mukasey include eighteen months of drug treatment for Burns because Burns "still . . . is yearning for drugs every minute of the day."  (See pages 16, 21 above.)

them.)[16/]  Indeed, Judge Mukasey in imposing sentence noted that he was going to "go off guidelines slightly" and sentenced Burns to 180 months, 30 months below the low end of the guidelines range of 210 to 260 months (and even further below the PSR calculation of 235 to 293 months).  (See page 21 above.)  That Judge Mukasey and defense counsel did not explicitly cite § 3553 is "irrelevant." (Gov't Letter Br. at 6.)  See, e.g., United States v. Vera Ramos, No. 07-3773-Cr., 2008 WL 4643808 at *1 (2d Cir. Oct. 21, 2008) ("While sentencing judges ordinarily are required to put Guidelines calculations on the record, this Court has not imposed a similar requirement with respect to § 3553(a) factors."); United States v. Verkhoglyad, 516 F.3d 122, 129, 131 (2d Cir. 2008) ("[T]he law in this circuit is well established that, in the absence of record evidence suggesting otherwise, we presume that a sentencing judge has faithfully discharged her duty to consider the statutory factors.  While our review is undoubtedly made easier if a district judge explicitly references the § 3553(a) factors, we have declined to prescribe any specific verbal formulations . . . to demonstrate the adequate discharge of the duty to consider matters relevant to sentencing. . . . . We reiterate that the law does not impose any rigorous requirement of specific articulation on sentencing judges with respect to their consideration of § 3553(a) factors.  No robotic incantations are required to prove the fact of consideration, and we will not assume a failure of consideration simply because a district

---

[16/]      At the conclusion of the November 30, 2005 hearing, Judge Mukasey also put on the record that:

> Your client is fortunate in one respect, that he has a good lawyer.  This one was very persistent.

(See page 17 above.)

court fails to enumerate or discuss each § 3553(a) factor individually.") (citations & quotations omitted); United States v. Fernandez, 443 F.3d at 29 ("'refrain[ing] from imposing any rigorous requirement of specific articulation [of the § 3553(a) factors] by the sentencing judge'"); United States v. Herrera, 186 Fed. Appx. 109, 112 (2d Cir. 2006) (Counsel was not ineffective where, although failing "specifically to address the factors set forth in 18 U.S.C. § 3553(a)," counsel "discuss[ed] some of these factors, notably, deterrence and the need to protect society [, and] . . . . the remaining statutory factors did not support a lenient sentence."); Rodriguez-Quezada v. United States, 06 Cr. 188, 08 Civ. 5290, 2008 WL 4302518 at *3 (S.D.N.Y. Sep. 15, 2008) ("[P]etitioner's counsel made essentially the same arguments [as to sentencing] that petitioner believes he should have made.  In any event, counsel was not ineffective for failing to make every argument exactly as petitioner would have liked. Counsel is entitled to use his or her professional judgment, within the range of competent professionalism, to decide which points to raise and how to raise them. . . . Counsel was not only competent but persuasive, as shown by the fact that petitioner received a below-Guidelines sentence based on all of the factors in 18 U.S.C. § 3553(a).").

Burns' claim that his second counsel was ineffective for failing to explicitly address the § 3553(a) factors, particularly Burns' cooperation with the government, is DENIED.

## CONCLUSION

For the reasons discussed above, Burns' § 2255 petition is <u>DENIED</u>.  A certificate of

appealability does not issue.


SO ORDERED.

DATED:      New York, New York
            December 3, 2008

_____
**Andrew J. Peck**
United States Magistrate Judge


Copies to:      Joseph Burns
                James E. Neuman, Esq.
                Edward Y. Kim, Esq.

H:\OPIN\BURNS-Joseph